IGNACIA S. MORENO
ASSISTANT ATTORNEY GENERAL, ENRD
STACEY H. MITCHELL
CHIEF, ENVIRONMENTAL CRIMES SECTION
J. RONALD SUTCLIFFE, IDAHO BAR NO. 6236
SENIOR TRIAL ATTORNEY

THOMAS E. MOSS, IDAHO BAR NO. 1058
UNITED STATES ATTORNEY
NANCY D. COOK, TEXAS BAR NO. 04741500
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
6450 N. MINERAL DRIVE, SUITE 210
COEUR D'ALENE, ID 83815
TELEPHONE: (208) 667-6568
FACSIMILE:  (208) 667-0814

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | ) | Criminal No.09-0043-N-BLW |
|---|---|---|
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S |
| vs. | ) | TRIAL MEMORANDUM |
| | ) | |
| JACK D. BARRON, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned attorneys, respectfully submits its Trial Memorandum.

I.      **PROCEDURAL HISTORY**

On February 18, 2009, the Grand Jury returned an indictment that charged Jack D. Barron, (Barron) with three felony Clean Water Act violations for allegedly discharging dredge and fill material into a tributary of Lamb Creek, onto wetlands adjacent to Lamb Creek, and dredging fill material from wetlands adjacent to a tributary of Lamb Creek then redepositing the

Government's Trial Memorandum            -1-

fill materials onto wetlands without the required permit. The charged violations occurred in 2007. Barron is also charged with one count of Obstruction of Justice relating to the letter he sent the United States Army Corps of Engineers (ACOE) regarding permission to build a pond.

Barron appeared with counsel (John Miller) for his arraignment/initial appearance on March 6, 2009. Counsel at the time indicated the appearance was limited to that day. The Court set a trial date for June 22, 2009. Attorney Miller withdrew from representation on April 29, 2009. Barron represented himself thereafter. The Government filed its Motions in Limine on May 15, 2009. Attorney Clark Peterson entered his appearance on May 20, 2009. Barron moved to continue the trial and the government joined in that request. The Court reset the trial to October 19, 2009. Barron again moved for a continuance on September 21, 2009. The government did not oppose. The Court reset the trial to December 7, 2009. Barron filed a series of Motions in Limine on November 6, 2009. The government responded to the motions on November 16, 2009. The Court again reset the trial in December 2009, for March 29, 2010.

## II.    ELEMENTS OF THE CHARGED OFFENSES

**A**. **Counts 1-3: Discharge of a pollutant without a NPDES permit- Clean Water Act, (CWA) 33 U.S.C.§§ 1311 (a); 1319 (c)(2)(A).**

Counts 1-3 charge Barron with violating the CWA by discharging fill materials into a wetland and a creek on Barron's property near the intersection of Highway 57 and Lamb Creek Road. To establish a CWA offense the government must prove the following elements:

(1) A person:

(2) Discharged a pollutant;

(3) From a point source;

Government's Trial Memorandum            -2-

(4) Into a water of the United States;

(5) Without or in violation of a permit; and

(6) The person acted knowingly.

Discharge of a pollutant- The term "discharge of a pollutant" and the term "discharge of pollutants" each means any addition of any pollutant to navigable waters, including wetlands, from any point source. (33 U.S.C. § 1362(12)).

Pollutant- The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into a water of the United States. (33 U.S.C.§1362(6)).

Point source- The term "point source" means any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural storm water discharges and return flows from irrigated agriculture. (33 U.S.C. § 1362(14)).

Navigable Waters- The term "navigable waters" includes the waters of the United States, including the territorial seas. (33 U.S.C.§1362(7)).

**B. Count 4: Obstruction of Justice- 18 U.S.C. § 1505.**

Count 4 charges Barron with obstructing justice by misleading ACOE regarding a pond he dug in the wetland on his property. To establish an obstruction offense the government must

Government's Trial Memorandum        -3-

prove the following elements:

> (1) A proceeding was pending before a department or agency of the United States;
>
> (2) The defendant was aware of the proceeding; and
>
> (3) The defendant intentionally endeavored corruptly to influence, obstruct or impede the proceeding.

IV. CLEAN WATER ACT LAW

    A. **Proving the Clean Water Act Violation.**

        1. **Jurisdiction after *Rapanos*.**

The Supreme Court granted certiorari on two questions in *Rapanos v. United States,* 126 S. Ct. : (1) whether jurisdiction under the FWPCA extends to wetlands that are adjacent to tributaries of navigable-in-fact waters and, if so, (2) whether such an interpretation of the FWPCA is constitutional. *See Rapanos*, 126 S.Ct. at 2220 (plurality opinion of Scalia, J.). In a fragmented ruling the court vacated and remanded both *Rapanos* and its conjoined twin, *Carabell* for further proceedings. Id. at 2235 (plurality opinion of Scalia, J.), 2252 (Kennedy, J., concurring in judgment). However, "no opinion command[ed] a majority of the Court." Id. at 2236 (Roberts, C.J., concurring). Instead, the justices issued a series of plurality, concurring, and dissenting opinions.

As to what waters the statute covers other than those navigable in traditional terms, the view of the four justices in the plurality was that the phrase "waters of the United States" is limited to "those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes," and "does not include channels through which water flows intermittently or ephemerally." Id. at

Government's Trial Memorandum      -4-

2225 (brackets, ellipses, and internal quotation Marks omitted). Additionally, the plurality would have required that the tributary be "connected to traditional interstate navigable waters." Id. at 2227.  How these various concepts – "relatively permanent", "intermittently", and "seasonal" – are supposed to relate to one another was left unclear.

Justice Kennedy did not join the plurality's opinion, but instead authored an opinion concurring in the judgment. Id. at 2236-2252 (Kennedy, J., concurring in judgment). He agreed with the plurality that the statutory term "waters of the United States" extended beyond water bodies that are navigable in fact, Id. at 2241 (Kennedy, J., concurring in judgment); however, he found the plurality's interpretation of the scope of the FWPCA to be "inconsistent with the Act's text, structure, and purpose." Id. at 2246 (Kennedy, J., concurring in judgment). As to the plurality's first limitation of jurisdiction to bodies of water that are relatively permanent, standing, or continuously flowing, Justice Kennedy specifically rejected the plurality's analysis as making "little practical sense in a statute concerned with downstream water quality." Id. at 2242, 2246 (Kennedy, J., concurring in judgment). Justice Kennedy also found "unpersuasive" the "plurality's second limitation – exclusion of wetlands lacking a continuous surface connection to other jurisdictional waters[.]" Id. at 2244.

Instead, Justice Kennedy posited a completely different test, concluding that "wetlands" are "waters of the United States" "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id*. at 2248 (Kennedy, J., concurring in judgment). With respect to wetlands adjacent to non-navigable tributaries, Justice Kennedy explained that, "[a]bsent more specific regulations, . . . the Corps must establish a

significant nexus on a case-by-case basis[.]" *Id.* at 2249.

Four justices, in a dissenting opinion authored by Justice Stevens, would uphold EPA's and the Corps' interpretation of "waters of the United States" *in toto*. See Id. at 2252-2265 (Stevens, J., dissenting).

In *Marks v. United States*, 430 U.S. 188 (1977), the Supreme Court stated that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds." Id. at 193 (internal quotation Marks omitted). Taken in isolation, the Marks court's reference to "those Members who concurred in the judgments" might suggest that lower courts, in determining the precedential effect of a fractured Supreme Court, should ignore the views of dissenting justices. The Supreme Court has subsequently recognized, however, that in some cases the Marks test is "more easily stated than applied to the various opinions supporting the result," Grutter v. Bollinger, 539 U.S. 306, 325 (2003) (quoting Nichols v. United States, 511 U.S. 738, 745 (1994)), and has acknowledged that "[i]t does not seem 'useful to pursue the Marks inquiry to the utmost logical possibility'" in every case, ibid. (quoting Nichols, 511 U.S. at 745-746).

In some fractured decisions, the narrowest rationale adopted by one or more justices who concur in the judgment may be the only controlling principle on which a majority of the court's members agree. In that situation, application of the rule announced in *Marks* provides a sensible approach to determining the controlling legal principles of the case. In *Rapanos*, though, as in some other instances, no opinion for the court exists and neither the plurality nor the concurring opinion is in any sense a "lesser-included" version of the other. In that circumstance, the

Government's Trial Memorandum            -6-

principles on which a majority of the court agreed may be illuminated only by consideration of the dissenting justices' views. The dissenting opinions, by emphasizing controlling legal principles on which a majority of the court agrees, may thereby contribute to an understanding of the law created by the case. Once those principles have been identified, sound legal and practical reasons justify a rule that a lower federal court should adhere to the view of the law that a majority of the Supreme Court has unambiguously embraced. *See Waters v. Churchill*, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the legal "test * * * that lower courts should apply," under Marks, as the holding of the court); cf. League of *United Latin American Citizens v. Perry*, 126 S.Ct. 2594, 2607 (2006) (analyzing concurring and dissenting opinions in a prior case to identify a legal conclusion of a majority of the Court); *Alexander v. Sandoval*, 532 U.S. 275, 281-282 (2001).

In sum, it is the government's position that the best explanation of the effect of *Rapanos* upon the issue of jurisdictional "waters of the United States" under the FWPCA is that the United States must prove that the receiving water is either (1) a relatively permanent continuously flowing tributary of navigable-in-fact waters, including seasonal waters that contain continuous flow during some months of the year, but may have no flow during dry months, or (2) that it is a water body that alone or in combination with similarly situated water bodies in the region significantly affects the chemical, physical, and biological integrity of navigable-in-fact waters. The jury must agree as to whichever of those standards is met by the evidence. Of course a jury could conclude that the evidence met both tests.

    **2.**  **Proof of the Clean Water Act Violations**.

Barron purchased a four-acre parcel of land in Priest Lake, Idaho, in November of 2006. Barron's property is at the southern end of a large wetland complex extending over 50 acres. In the 1930s, the Forest Service built a road across the wetland which forms the northern border of Barron's property. The wetland complex also extends south of Barron's property abutting Lamb Creek. An unnamed stream flows southerly through the wetland and is channelized for about a quarter mile above the Forest Service road where the stream channel flows alongside the highway and then through a culvert under the Forest Service road. The unnamed stream resumes its course just downstream from Barron's property and then flows into Lamb Creek, a navigable water, 1600 linear feet from Barron's property line. Lamb Creek flows into Priest Lake approximately four miles from Barron's property. There can be little doubt that a tributary of a water of the United States is itself a water of the United States. *United States v. Moses*, 496 F.3d 984, 988 (9th Cir. 2007).

During the spring and summer of 2007, Barron utilized a backhoe to clear sections of the parcel, placed fill for a driveway, and constructed a concrete foundation on the parcel. He also dug a pond and diverted water from a nearby stream. Various officials from ACOE and the U.S. Forest Service t repeatedly told Barron that the parcel is a wetland and that construction without a permit is not permitted. In the course of the ACOE investigation Barron wrote a letter to ACOE claiming that the Idaho Department of Water Resources (IDWR) gave him permission to build a pond on the property. Although Barron had applied to IDWR for a permit to construct a pond and divert water to the pond, IDWR never granted Barron's permit application. When asked by investigators whether he had a permit to build in a wetland, Barron told the investigators it was his position that the Government is required to prove to him that the property

is a wetland before he is required to ask for a permit.

        **3.**        **Witnesses**

The government will call Kelly O'Neill. O'Neill is a Special Agent for the Environmental Protection Agency who interviewed Barron and investigated the matter. O'Neill is expected to testify regarding the general topography he observed at Barron's property; that Barron admitted he had contacted by several Army Corps of Engineers (ACOE) who told him he needed a permit before fill or construction activities could begin; that he removed brush and other plants from the property and removed topsoil and redistributed the topsoil; that he had a permit to construct the pond on the property; that he felt the property was his and he could do whatever he wants with the property.

Dean Hilliard is a retired ACOE employee. He told Barron that he would need a permit to place fill on his property on Lamb Creek Road. Barron told Hilliard that he wanted to put a house on the property, did not think the property was a wetland and wanted to place a culvert along the road. In a second telephone call Hilliard told Barron he was in violation of the law for placing fill on the property for a driveway. After the call Barron continued with further placement of fill, stripping of vegetation and digging in the unnamed creek which flows along the side of his property and empties into Lamb Creek.

Larry Elliot is a retired Forest Service employee who formerly managed road maintenance for the Forest Service in the Priest Lake area. Barron contacted Elliot about obtaining an "approach" agreement. This agreement would allow Barron to place a driveway from the Forest Service road onto his property. Approach agreements ensure that traffic coming onto and leaving Forest Service roads will not create dangerous conditions and any culvert

installed will not undermine or cause damage to the roadway. Elliot told Barron in the spring of 2007, that Barron should obtain proper wetlands permitting from ACOE before he would issue an approach agreement. Elliot never issued the agreement and noticed several weeks later someone had installed a culvert and driveway leading off the Forest Service Road. In the summer of 2007, Barron approached Elliot and complained that a culvert along the side of his property was causing flooding. Elliot inspected the site and found the culvert to be working properly.

ACOE Regulatory Project Manager Beth Reinhart will testify that on June 4, 2007, she attempted to perform a field investigation at Lamb Creek property owned by Barron. Reinhart observed the placement of fill and a culvert in what appeared to be a wetland. Barron did not have a permit for placement of fill on the property. Barron was onsite and admitted to Reinhart that he had placed the culvert, and the fill on his property. Reinhart told Barron his property appeared to be a wetland and that a permit was required to place fill on the property. Reinhart attempted to perform a site inspection to more closely assess the Lamb Creek property's wetland characteristics and measure the extent of the fill. Barron denied Reinhart access to the property and became belligerent.

Jan Brioso will testify that she and her husband own property on uplands across the Forest Service road from Barron's property. Brioso observed that starting in May of 2007, and continuing throughout the summer, Barron used his front-end loader to place fill and gravel on the property. Brioso will introduce photographs of the property taken during Barron's work on the property which detail the extensive stripping of vegetation and placement of fill. Brioso's husband informed Barron in the spring of 2007 he should not build on the property because it is

a wetland. Brioso saw Barron install the foundation for the house over the Labor Day weekend in 2007.

Jill Cobb is a hydrologist for the U.S. Forest Service and works out of an office a few miles up the road from Barron's property. Cobb has been noticed as an expert. She is familiar with the Lamb Creek drainage and more importantly its history. Cobb will testify regarding the Forest Service road that runs across the property. The road did not create the wetland as Barron contends, but just segmented a large wetland complex. Ms. Cobb has walked the entire drainage and will testify that there is a hydrologic connection to Lamb Creek and that Lamb Creek is navigable in fact. Finally, Cobb will testify that the work Barron performed in the wetland has affected not only the unnamed stream flowing through the wetland complex, but Lamb Creek itself.

Keith Franklin from the Idaho Department of Water Resources will testify that Barron applied for a permit to divert water from the unnamed creek on his property to a pond he intended to dig. Franklin's records indicate the Department did not grant the permit.

Nels Gordon will testify that he is a local real estate agent and has worked in northern Idaho for over twenty years. He observed Barron working on the property with a backhoe buried in mud up to the axles in the summer of 2007.

Jody Mason is a kayaker who will testify regarding aquatic recreation in Lamb Creek. He will introduce photos of himself kayaking on the lower stretches of Lamb Creek.

Donnie W. Pettit will testify that he owns a local excavation company in Priest River, Idaho. Barron contacted Pettit to buy dirt. Barron told Pettit he wanted to place fill around his foundation. Pettit was familiar with the location of Barron's property from having lived in the

area his entire life. Barron bragged to Pettit that he had expelled an ACOE inspector from his property who was attempting to determine if the property was a wetland. In the summer of 2007, Pettit observed Barron operating a backhoe in the creek on Barron's property. Pettit did not believe it was possible to build on Barron's property based upon his experience with excavations in the Priest River area and the fact that Barron's property had been for sale for many years at a low price. Pettit did not sell Barron any fill.

Dale Hatch will testify he is a landscape architect. He grew up near the Barron property. Hatch is familiar with the property because he observed the property on an almost daily basis from the 1962 until the mid 1990s and knows that the property is wet at least nine months a year. The property had a reputation in the community for being wet. Hatch was aware someone cleared the property and placed a foundation on the property.

At trial the government expects to present John Olson, as an expert witness. Olson works for the Environmental Protection Agency (EPA). He performed a wetlands delineation on Barron's property pursuant to a search warrant. Olson concluded the property is a wetland based upon numerous criteria and in conformance with ACOE's 1987 Wetlands Delineation Manual and Supplements (a subject of a pending Motion in Limine). While Barron stripped most of the vegetation from the property, Olson was able to identify wetlands species both from the property and in adjacent non-disturbed properties. Olson further concluded that the hydrology of Barron's property is consistent with wetlands. Finally, Olson determined that the soils present on the property are consistent with saturated wetlands soils.

Barron has his own two expert witnesses who will claim that the property does not qualify as a wetland. The government disputes the analyses. The government will offer a

Government's Trial Memorandum        -12-

rebuttal witness, Mary Ann Theising, to discuss the flaws in Barron's experts' opinions. Diane Hodel is a Forest Service road manager who will also potentially testify in rebuttal. She examined the culvert on Barron's property and concluded the culvert was operating as designed and without a problem.

## CONCLUSION

Most of the prosecution's case in this matter will consist of fact witnesses from various governmental agencies. Those witnesses include officials who told Barron he needed a permit for construction and filling activities on his property as well as EPA personnel who interviewed Barron. The government expects that the remainder of the trial and the main focus will consist of expert witness opinions.

DATED this 22nd day of March, 2010.

THOMAS E. MOSS
United States Attorney

_____
/s/ Nancy D. Cook
Assistant United States Attorney

_____
/s/J. Ronald Sutcliffe
Senior Trial Attorney
Department of Justice

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of the United States Department of Justice, and that a copy of the foregoing Government's Trial Memorandum was served on all parties named below this 22nd day of March, 2010.

   X  ECF Filing

Jim Siebe
Attorney for Jack Barron

_____
/s/ Nancy D. Cook
Assistant U.S. Attorney

_____
/s/J. Ronald Sutcliffe
Senior Trial Attorney
Department